**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on September 30, 2004**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 05-018 (RCL)** |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | |
| **ROBERT E. QUINN,** | : | **50 U.S.C. § 1705** |
| **MICHAEL H. HOLLAND,** | : | **(International Emergency Economic** |
| **MOHAMMED A. SHARBAF,** | : | **Powers Act)** |
| | : | |
| **Defendants.** | : | **31 C.F.R. Part 560** |
| | : | **(Iranian Transaction Regulations)** |
| | : | |
| | : | **15 C.F.R. Parts 730-774** |
| | : | **(Export Administration Regulations)** |
| | : | |
| | : | **Executive Order 13222** |
| | : | |
| | : | **18 U.S.C. § 2** |
| | : | **(Aiding and Abetting)** |

**I N D I C T M E N T**

The Grand Jury charges that:

**COUNT ONE**

At times material to this Indictment:

**INTRODUCTION**

1.      Clark Material Handling Company ("CMHC") was a manufacturer and seller of

lift trucks and lift truck parts.  Its headquarters was in Lexington, Kentucky.  Clark Material

Handling Asia ("CMHA") was an affiliate company of CMHC with locations in Bucheon and

Chongwon, Korea.  Similarly, Clark Material Handling International ("CMHI") was another

affiliate company of CMHC, and it had offices in Seoul, Korea.

2.      Defendant **ROBERT E. QUINN** was Vice President, Global Parts Marketing, for

CMHC and later Executive Vice President of Global Business for CMHI.

3.      Defendant **MICHAEL H. HOLLAND** was Government/National Accounts Parts

Sales Representative for CMHC.

4.      Defendant **MOHAMMED A. SHARBAF** represented himself to be the president

and managing director of Sepahan Lifter Company ("Sepahan Lifter").  Sepahan Lifter had its

principal office in Esfahan, Iran.  It manufactured lift trucks and sold lift trucks and lift truck

parts to customers in Iran.  Sepahan Lifter's products included forklift truck having a 5-ton rated

capacity, suitable for outdoor as well as indoor use, and having the "highest degree of stability,

torsion resistance, and ruggedness."  Such forklifts were used for moving large and heavy items

such as boats and other vehicles, industrial machinery, and heavy military equipment.  Sometime

in or around 1993, Sepahan Lifter signed an agreement with a former affiliate company of

CMHC then located in Mulheim, Germany ("Clark Germany").  Under the contract with Clark

Germany, Sepahan Lifter obtained components and designs to build lift trucks.  Sepahan Lifter's

purchases from Clark Germany continued until Clark Germany went into bankruptcy in or

around January 2003.

5.      Co-conspirator Khalid Mahmood did business as Sharp Line Trading ("Sharp

Line") in Dubai, United Arab Emirates ("U.A.E.").

6.      Co-conspirator GZ was a purchasing manager for Sepahan Lifter.

<u>International Emergency Economic Powers Act (IEEPA)</u>

7.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C.

§§ 1701-1706, authorized the President of the United States to impose economic sanctions

against a foreign country in response to an unusual or extraordinary threat to the national

security, foreign policy, or economy of the United States when the President declares a national

emergency with respect to that threat.

8.     On March 15, 1995, the President issued Executive Order No. 12957 finding that

"the actions and policies of the Government of Iran constitute an unusual and extraordinary threat

to the national security, foreign policy, and economy of the United States" and declaring "a

national emergency to deal with that threat."  Executive Order No. 12957, as expanded and

continued by Executive Orders No. 12959 and 13059 and Presidential Notice of March 10, 2004,

was in effect at all times relevant to this Indictment.  The Presidential Notice of March 10, 2004,

additionally noted that the threat posed by Iran to the United States's national security, foreign

policy, and economy included Iran's "support for international terrorism."

9.     Executive Orders No. 12959 and 13059 (the "Executive Orders") imposed

economic sanctions, including a trade embargo, on Iran.  The Executive Orders prohibited,

among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran

of any goods, technology, or services from the United States or by a United States person.  The

Executive Orders also prohibited any transaction by any United States person or within the

United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition

set forth in the Executive Orders.

## The Iranian Transaction Regulations

10.     The Executive Orders authorized the Secretary of the Treasury, in consultation

with the Secretary of State, "to take such actions, including the promulgation of rules and

regulations, as may be necessary to carry out the purposes" of the Executive Orders.  Pursuant to

this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations

("ITR"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

11.     Under the Iranian Transaction Regulations, 31 C.F.R. Part 560:

     a.     Section 560.204 provided that no goods, technology, or services may be
exported, re-exported, sold, or supplied to Iran, directly or indirectly, from
the United States or by a United States person wherever located, without
authorization.  31 C.F.R. 560.204

     b.     Section 560.203 prohibited any transaction by any United States person or
within the United States that evaded or avoided, or had the purpose of
evading or avoiding, or that attempted to violate, any of the prohibitions
set forth in Part 560.  Section 560.203 further prohibited any attempt to
violate the prohibitions contained in Part 560.  31 C.F.R. § 560.203.

     c.     Section 560.205(a) prohibited the re-exportation to Iran from a third
country, directly or indirectly, by a person other than a United States
person, of any goods, technology, or services that originated in the United
States, if:

          i.     undertaken with knowledge or reason to know that the re-
exportation was intended specifically for Iran or for the

Government of Iran; and

ii.    the exportation of such goods, technology, or services from the

United States to Iran was unauthorized.

The export or re-export to Iran of CMHC lift truck components was subject to the ITR.

12.    The United States Department of the Treasury's Office of Foreign Assets Control

("OFAC"), located in the District of Columbia, had responsibility for administering the ITR and

was the entity empowered to authorize transactions with Iran during the embargo.  Such

authorization, if granted, would be in the form of a license.

<u>The Export Administration Regulations</u>

13.    The Export Administration Act ("EAA"), 50 U.S.C. App. §§ 2101-2420,

authorized the United States Secretary of Commerce to prohibit or curtail the export of any

goods, technology, or software items, as necessary, to protect, among other things, the national

security and foreign policy of the United States.  The Secretary of Commerce implemented that

authority through the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774.

Although the EAA expired, the EAR continued to be in effect under the provisions of IEEPA, by

virtue of Executive Order 13222 (August 17, 2001), as extended by successive Presidential

notices.

14.    The EAR identified items over which the Department of Commerce exercised

jurisdiction.  Items "subject to the EAR" included "all items in the United States" and "all U.S.

origin items wherever located."  15 C.F.R. § 734.3.  The EAR specifically provided that: "No

person may export or reexport items subject to both the EAR and OFAC's Iranian Transactions

Regulations without prior OFAC authorization."  15 C.F.R. § 746.7.

15.     Part 764 of the EAR provided that:

    a.     no person may engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by, the EAA, the EAR, or any order, license, or authorization issued thereunder (15 C.F.R. § 764.2(a));

    b.     no person may cause or aid, abet, counsel, induce, procure, or permit the doing of any act prohibited, or the omission of any act required, by the EAA, the EAR, or any order, license, or authorization issued thereunder (15 C.F.R. § 764.2(b));

    c.     no person may solicit or attempt a violation of the EAA, the EAR, or any order, license or authorization issued thereunder (15 C.F.R. § 764.2(c)); and

    d.     no person may conspire or act in concert with one or more persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of the EAA, the EAR, or any order, license or authorization issued thereunder (15 U.S.C. § 764.2(d)).

## THE CONSPIRACY

16.     Beginning in or around February 2003 and continuing through in or around December 2004, within the District of Columbia and elsewhere, the defendants, **ROBERT E. QUINN**, **MICHAEL H. HOLLAND**, and **MOHAMMED A. SHARBAF**, and others known and unknown to the Grand Jury, knowingly and willfully combined, conspired, confederated, and agreed with each other to violate IEEPA, the ITR, and EAR by exporting and attempting to export U.S. origin commodities – to wit, CMHC lift truck parts – to Iran without having first obtained the required authorizations from OFAC, located in the District of Columbia.

-6-

## OBJECTS OF THE CONSPIRACY

17. The objects of the conspiracy were:

 a. to secure a potentially large customer for CMHC lift truck parts and to enhance the standing and positions of defendants **ROBERT E. QUINN** and **MICHAEL H. HOLLAND** within their respective companies;

 b. to export and provide CMHC lift truck parts to the country of Iran;

 c. to provide material support for the industrial manufacturing base and infrastructure of the country of Iran, a country whose regime had for years been designated by the United States government as a supporter of international terrorism;

 d. to evade the prohibitions and licensing requirements of IEEPA, the ITR, and the EAR; and

 e. to conceal the prohibited activities and transactions from detection by the United States government so as to avoid penalties and disruption of the illegal activity.

## MANNER AND MEANS OF THE CONSPIRACY

18. The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

 a. Defendant **MOHAMMED A. SHARBAF** and co-conspirator GZ would send requests for price quotations on behalf of Sepahan Lifter for CMHC lift truck parts to defendants **ROBERT E. QUINN** and **MICHAEL H. HOLLAND**.  At times, the requests for price quotations would come

directly from defendant **SHARBAF** and co-conspirator GZ; on other occasions, Sepahan Lifter would enlist co-conspirator Khalid Mahmood to make the inquiries.

b.      If the price quotations were acceptable to Sepahan Lifter, defendants **ROBERT E. QUINN** and **MICHAEL H. HOLLAND** would arrange to have CMHC ship the lift truck parts to co-conspirator Khalid Mahmood and his company, Sharp Line, in Dubai, U.A.E.  Upon receipt of the parts in the U.A.E., co-conspirator Khalid Mahmood would then re-export them to Sepahan Lifter in Iran.  Mahmood would pay CMHC for the parts and, in turn, would receive compensation from Sepahan Lifter.  In this manner, the co-conspirators were able to conceal from the United States government that the true destination of the CMHC parts was Iran.

c.      Defendants **ROBERT E. QUINN** and **MICHAEL H. HOLLAND** also made efforts to use CMHA and a new Clark company being established in Germany as the conduits for CMHC parts to Sepahan Lifter in Iran.

d.      Neither defendants **ROBERT E. QUINN, MICHAEL H. HOLLAND, MOHAMMED A. SHARBAF**, nor their co-conspirators obtained the required licenses from OFAC, located in the District of Columbia, for any of the exports of CMHC lift truck parts to Iran.

## OVERT ACTS

19.      In furtherance of this conspiracy, the defendants, **ROBERT E. QUINN, MICHAEL H. HOLLAND**, **MOHAMMED A. SHARBAF**, and other co-conspirators

committed overt acts, including but not limited to the following:

(1)      In or around February 2003, defendant **MOHAMMED A. SHARBAF** directed co-conspirator Khalid Mahmood to contact defendant **ROBERT E. QUINN** to seek price quotations for CMHC lift truck parts for export to Sepahan Lifter in Iran.

(2)      On or about February 23, 2003, defendant **ROBERT E. QUINN** sent an electronic mail message ("e-mail") to co-conspirator Khalid Mahmood, advising him, "We can handle parts immediately now."

(3)      On or about March 6 and March 7, 2003, defendants **ROBERT E. QUINN** and **MOHAMMED A. SHARBAF** met in Mulheim, Germany, and agreed that CMHC would supply Sepahan Lifter with lift truck parts.

(4)      On or about March 10, 2003, defendant **MOHAMMED A. SHARBAF** sent an e-mail to defendant **ROBERT E. QUINN** in which **SHARBAF** wrote:

> For a good start, kindly send 2 following items to address of Sharp Line in fastest way today.  In case we must transfer in advance, kindly send an e-mail to Sharp Line, Mr. Khalid Mahmood is authorized to manager [sic] for this subject.

(5)      On or about March 13, 2003, defendant **ROBERT E. QUINN** forwarded the e-mail from defendant **MOHAMMED A. SHARBAF** described in Overt Act (4) above to an employee of a CMHC dealer in Chester, Virginia, and wrote:

> Can you put these two parts on order for me.  We need to move these to Dubai.  I will help you with the process for this one.  I will call and follow up with you on this one.

(6)      On or about March 14, 2003, defendant **ROBERT E. QUINN** sent an e-mail to co-conspirator Khalid Mahmood, with a copy to defendant **MOHAMMED A. SHARBAF**, providing quotes on 377 CMHC spare parts.

(7)      On or about March 16, 2003, defendant **ROBERT E. QUINN** sent an e-mail to a CMHC employee requesting information about CMHC bank accounts in order to assist Sharp Line in wiring funds to CMHC, stating:

> We only have a small order, a couple of hundred dollars this time.  However, we are quoting them $385,000.

(8)      On or about March 28, 2003, defendant **ROBERT E. QUINN** caused an employee of a CMHC dealer in Chester, Virginia, to ship 10 brackets, CMHC product number 2794317, to Sharp Line in Dubai, U.A.E., for re-export to Sepahan Lifter in Iran.  At no time did any of the defendants or their co-conspirators obtain a license from OFAC in the District of Columbia before exporting the CMHC lift truck parts to Iran.

(9)      On or about April 10, 2003, defendant **MOHAMMED A. SHARBAF** sent an e-mail to defendant **ROBERT E. QUINN** seeking to receive better prices for CMHC lift truck parts than the prices included in a facsimile that **QUINN** sent him on March 31, 2003.

(10)      On or about August 20, 2003, CMHC shipped a quantity of CMHC lift truck parts to Sharp Line in Dubai, U.A.E., for re-export to Sepahan Lifter in Iran.  At no time did any of the defendants or their co-conspirators obtain a license from OFAC in the District of Columbia before exporting the CMHC lift truck parts to Iran.

(11)      On or about October 17, 2003, co-conspirator Khalid Mahmood sent an e-mail to defendant **MICHAEL H. HOLLAND** requesting that **HOLLAND** add "100 pieces of fuse 15 A, part no. 2774049 . . . ."

(12)      On or about October 20, 2003, CMHC shipped a quantity of CMHC lift truck parts to Sharp Line in Dubai, U.A.E., for re-export to Sepahan Lifter in Iran.  At no time

did any of the defendants or their co-conspirators obtain a license from OFAC in the District of Columbia before exporting the CMHC lift truck parts to Iran.

(13)   On or about November 8, 2003, defendant **MICHAEL H. HOLLAND**, sent an e-mail to co-conspirator GZ, writing: "Bob Quinn requested that I quote on your inquiry no. 0076/82/TM.  Please find the attached quote.  If you have any questions or in need of future quotes and Clark Parts please keep me in mind."

(14)   On or about November 8, 2003, co-conspirator GZ sent an e-mail to defendant **MICHAEL H. HOLLAND**, stating:

> Kindly let me know [sic] these goods will ship from which location because if they ship from America, it's may [sic] be to have problem for you.  We start to cooperate with you because Mr. Quinn said [sic] us that the goods will ship from Asia.

(15)   On or about November 11, 2003, co-conspirator GZ sent an e-mail to defendant **MICHAEL H. HOLLAND**, with a copy to defendant **ROBERT E. QUINN**, writing:

> Kindly note that I confirm your proposal no. 3110003 dated 07.11.2003 as our order no. 0076/82/TM.  Please arrange that the goods [sic] to be airfreighted from Seul [sic] (Korea) to destination of Esfahan - Iran.  Please advised [sic] your partner in Korea to deliver material to Iran air Seul [sic] we will pay the freight at destination. . .  We for safety security to [sic] prefer to transfer money to your account in Korea.  It is better for safety security in case of 3rd party investigation.

(16)   On or about November 13, 2003, defendant **MICHAEL H. HOLLAND** sent an e-mail to co-conspirator GZ, stating: "I am working with Korea to receive shipment of order and with finance to work the exchange of money."

(17)   On or about November 21, 2003, after an executive at CMHA balked at CMHA serving as a conduit for shipments of CMHC lift truck parts to Sepahan Lifter in Iran, defendant **ROBERT E. QUINN** sent an e-mail to the CMHA executive, stating:

We should discuss Sales and Marketing concepts for increasing business with and
through the US organization called CMHC.  They are a customer which I think you asked
me how to increase the volume . . .  The reality is the US cannot do business with Iran by
Law.  They are trying to pass the business to you.  Please call and talk to them on the
phone.

(18)     On or about December 1, 2003, co-conspirator GZ sent an e-mail to

defendant **ROBERT E. QUINN**, with a copy to defendant **MICHAEL H. HOLLAND**, writing:

Please be informed that I received one P/I from Mr. Holland dated 08.Nov.2003 and up to
now I am waiting for parts that unfortunately I don't have any excat [sic] reply.  Kindly
note that this order is very very very urgent order that if you can't send parts through
CMHA, please send them to SHARP LINE TRADING in Dubai Mr. Khalid Mahmood
by courier and then he will send them for me and we will instruct him to remit account of
order no. 0076/82/TM to your account immediately.

(19)     On or about December 1, 2003, defendant **MICHAEL H. HOLLAND**

sent a reply e-mail to co-Conspirator GZ, with a copy to defendant **ROBERT E. QUINN**,

stating:

I am so sorry for this delay.  I understand we are shipping this order to Sharpline trading
instead of Korea.  I am waiting final word from them on shipping.

(20)     On or about December 2, 2003, defendant **MICHAEL H. HOLLAND**

sent an e-mail to co-conspirator Khalid Mahmood, with a copy to defendant **ROBERT E.**

**QUINN**, in reference to "order no. 0076/82/TM" and wrote: "Attached you will find the order

with shipping cost of $996.15 to Dubia [sic] for the total amount of $25,547.65."

(21)     On or about December 3, 2003, CMHC shipped a quantity of CMHC lift

truck parts to Sharp Line in Dubai, U.A.E., for re-export to Sepahan Lifter in Iran.  At no time

did any of the defendants or their co-conspirators obtain a license from OFAC in the District of

Columbia before exporting the CMHC lift truck parts to Iran.

(22)     On or about December 9, 2003, defendant **MICHAEL H. HOLLAND**

-12-

sent an e-mail to co-conspirator GZ, stating:

> Your first order has been shipped and I will quote on the 2nd.  As I stated awhile back.  All orders were going to be handled by of [sic] Company in Korea, however, they didn't take the ball and run with it.  I will be happy to quote you but will have to go through sharp line trading to do it.  If this works for you please let me know.

(23)    On or about December 18, 2003, CMHC shipped a quantity of CMHC lift truck parts to Sharp Line in Dubai, U.A.E., for re-export to Sepahan Lifter in Iran.  At no time did any of the defendants or their co-conspirators obtain a license from OFAC in the District of Columbia before exporting the CMHC lift truck parts to Iran.

(24)    On or about December 19, 2003, defendant **MICHAEL H. HOLLAND** sent an e-mail to co-conspirator Khalid Mahmood, writing:

> Your quote is fine.  Do you want to send your quote on to [Co-conspirator GZ].  What I would like to do now and in the future if it's ok with you, is they send you the request for quote and then you update the quote and send it on to them.  Everything will go through you including the shipping of parts.

(25)    On or about December 21, 2003, defendant **ROBERT E. QUINN** sent an e-mail to the president of CMHA to complain about the unwillingness of a CMHA executive to assist in exporting CMHC lift truck parts to Sepahan Lifter in Iran through Korea.  In the e-mail, **QUINN** wrote:

> Again, the CMHC Parts group can not ship to Iran.  They can not even know the parts are shipping to Iran.  We made the first shipment to start to bring Sharbaf back to the Clark factory.  This was done through a third party and very difficult for the customer to manage.
>
> We are a new Clark and must seize all the Parts Sales opportunities we can.

(26)    On or about January 13, 2004, defendant **MICHAEL H. HOLLAND** sent an e-mail to defendant **ROBERT E. QUINN**, writing:

I hate to ask this, but will you inform [co-conspirator GZ] that any request she might have will need to go through you or Sharpline and not directly to CMHC (me). [A CMHC executive] doesn't want me to have any emails or phone calls that could put CMHC in any danger.  There is no suspension of the trade embargo as they have stated in various emails at this time and as [the CMHC executive] has stated to me (is off limits).  If Sharpline ask [sic] for me to quote them or CMHA I will be more than happy and respond to their request ASAP.  When I get done with the current quote I will send it to you.

(27)    On or about January 21, 2004, defendant **ROBERT E. QUINN** sent an e-mail to defendant **MICHAEL H. HOLLAND** and a CMHC executive, stating:

We would like to go over the process of ordering parts from CMHC and shipping them to the Middle East.  And options of how we can do that.  On another email I will write up a few scenarios to accomplish our goals.  We would like to review them with you.  And the transaction processing to keep you out of trouble with the boys in Iran.

(28)    On or about March 14, 2004, defendant **ROBERT E. QUINN** sent an e-mail to defendant **MICHAEL H. HOLLAND**, writing:

Can you please review this quote you prepared.  What would the transfer price be to Clark from you.  Please advise ASAP.  We would ship to CMHEU and than [sic] resell them from our new company in Germany.  Mr. Sharbaf is here in Korea, he would like an update asap.

We may have an opportunity for a large volume of parts from Sepahan lifter through CMHEU.  They will have no problem dealing with Sepahan.

(29)    On or about March 16, 2004, defendant **MICHAEL H. HOLLAND** provided defendant **ROBERT E. QUINN** with the information that he sought in Overt Act (28) and added, "I would be glad to help out in any manner that is needed for CMHA or Germany to get this business."

(30)    On or about March 28, 2004, defendant **ROBERT E. QUINN** sent an e-mail to defendant **MICHAEL H. HOLLAND**, stating:

Mr. Sharbaf has given me this as our first order for the new Clark Material Handling European Union.  We would purchase the items from CMHC, ship to CMHEU.  We

would take over the transaction and ship onward to the final destination and bill. . .  We want to confirm the price and availability this week . . .  We believe there is about a Million dollar spare parts opportunity for all of us in this one.

(31)    On or about March 31, 2004, defendant **MICHAEL H. HOLLAND**

responded to the request of defendant **ROBERT E. QUINN** described in Overt Act (31),

writing: "Bob here is the updated list . . .  If we get the business please send some my way."

Defendant **ROBERT E. QUINN** replied, "The whole thing will come your way if I get the

order."

(32)    On or about May 24, 2004, defendant **MOHAMMED A. SHARBAF** sent

an e-mail to defendant **ROBERT E. QUINN**, stating:

[W]e have enclosed lists for 75 items of spare parts which in the past CMHA has not been able to sell us.  Then I kindly ask you to inform CMHC for an offer in basis of lowest price, after we will receive quotation we will manage the deal thru 3rd party.

(33)    On or about May 24, 2004, defendant **ROBERT E. QUINN** replied to the

e-mail from defendant **MOHAMMED A. SHARBAF** described in Overt Act (32) and wrote:

We will work on the Parts numbers for your right away.  I will make all the arrangements for pricing from CMHC and proper shipping to Sepahan.  We will make this happen right away for you.  Clark Material Handling International will invoice you for the parts order. We will ship via Mulheim to you to take care of the order.

(34)    On or about June 24, 2004, co-conspirator GZ sent an e-mail to defendant

**ROBERT E. QUINN**, stating: "Please be noted [sic] that I have new inquiry as per follow which

this part has **American Supplier** and you are kindly requested to offer from **Clark USA**."

(35)    On or about June 25, 2004, defendant **ROBERT E. QUINN** forwarded

the e-mail from co-conspirator ZG described in Overt Act (34) to defendant **MICHAEL H.**

**HOLLAND** and asked, "Can you provide a quote"?

-15-

(36)     On or about July 7, 2004, co-conspirator Khalid Mahmood sent an e-mail to defendant **MICHAEL H. HOLLAND**, stating:

> Thanks a lot for the prompt offer, please note the following two items are missing in your offer.  Please advise price & delivery of these also.

(37)     On or about December 1, 2004, when questioned by federal law enforcement agents about his involvement in and knowledge of exports of CMHC products to Iran through Dubai, defendant **MICHAEL H. HOLLAND** falsely stated that, to his knowledge, all exports to Dubai in which he was involved were "supposed to stay there" and that he had no knowledge of any CMHC parts going to Iran.

(38)     On or about December 28, 2004, when questioned by federal law enforcement agents about his involvement in and knowledge of exports of CMHC products to Iran through Dubai, defendant **ROBERT E. QUINN** falsely stated: (1) that he never coordinated any transactions with Iran; (2) that, although he had instructed defendant **MICHAEL H. HOLLAND** to provide quotations for CMHC parts to Sepahan Lifter, none of these quotations ever resulted in orders; (3) that he was unaware of any relationship between Sharp Line and Sepahan Lifter; (4) that he was unaware of any shipments of CMHC parts to Sharp Line or of any shipments of CMHC parts to Sharp Line that were re-exported to Iran.

(**Conspiracy to Violate the United States Iranian Embargo**, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 560.205; Title 15, Code of Federal Regulations, Sections 746.7, 764.2(a), 764.2(b), 764.2(c), 764.2(d), 764.2(e), 764.2(h), and 764.3(b)(2); and Executive Order 13222.

## COUNT TWO

20.      Paragraphs 1 through 15 and 17 through 19 of Count One of this Indictment are re-alleged as if fully set forth herein.

21.      On or about March 28, 2003, within the District of Columbia and elsewhere, defendants **ROBERT E. QUINN** and **MOHAMMED A. SHARBAF** willfully exported and attempted to export 10 CMHC brackets, product number 2794317, from the United States to Iran, via the United Arab Emirates, without first having obtained the required authorization from the United States Department of the Treasury's Office of Foreign Assets Control, located in the District of Columbia, as prohibited by the ITR and the EAR.

(**Violation of the United States Iranian Embargo**, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 560.205; Title 15, Code of Federal Regulations, Sections 746.7, 764.2(a), 764.2(b), 764.2(c), 764.2(e), 764.2(h), and 764.3(b)(2); and Executive Order 13222; **Aiding and Abetting and Causing an Act to Be Done**, in violation of Title 18, United States Code, Section 2)

## COUNT THREE

22.      Paragraphs 1 through 15 and 17 through 19 of Count One of this Indictment are re-alleged as if fully set forth herein.

23.      On or about August 20, 2003, within the District of Columbia and elsewhere, defendants **ROBERT E. QUINN** and **MOHAMMED A. SHARBAF** willfully exported and attempted to export a quantity of CMHC lift truck parts, to wit,

    1 lh brake ca, part number 06930002,
    2 brake pad k, part number 06929996,
    2 STARTER DRI, part number 06925185, and
    1 rh brake ca, part number 06929997

from the United States to Iran, via the United Arab Emirates, without first having obtained the

required authorization from the United States Department of the Treasury's Office of Foreign

Assets Control, located in the District of Columbia, as prohibited by the ITR and the EAR.

(**Violation of the United States Iranian Embargo**, in violation of Title 50, United States Code,
Section 1705; Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 560.205;
Title 15, Code of Federal Regulations, Sections 746.7, 764.2(a), 764.2(b), 764.2(c), 764.2(e),
764.2(h), and 764.3(b)(2); and Executive Order 13222; **Aiding and Abetting and Causing an
Act to Be Done**, in violation of Title 18, United States Code, Section 2)

## COUNT FOUR

24.     Paragraphs 1 through 15 and 17 through 19 of Count One of this Indictment are

re-alleged as if fully set forth herein.

25.     On or about October 20, 2003, within the District of Columbia and elsewhere,

defendants **ROBERT E. QUINN** and **MOHAMMED A. SHARBAF** willfully exported and

attempted to export a quantity of CMHC lift truck parts, to wit,

> 3 Brake Calip, part number 06933901,
> 15 STARTER DRI, part number 06925185, and
> 100 15 AMP FUSE, part number 062774040

from the United States to Iran, via the United Arab Emirates, without first having obtained the

required authorization from the United States Department of the Treasury's Office of Foreign

Assets Control, located in the District of Columbia, as prohibited by the ITR and the EAR.

(**Violation of the United States Iranian Embargo**, in violation of Title 50, United States Code,
Section 1705; Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 560.205;
Title 15, Code of Federal Regulations, Sections 746.7, 764.2(a), 764.2(b), 764.2(c), 764.2(e),
764.2(h), and 764.3(b)(2); and Executive Order 13222; **Aiding and Abetting and Causing an
Act to Be Done**, in violation of Title 18, United States Code, Section 2)

## COUNT FIVE

24.     Paragraphs 1 through 15 and 17 through 19 of Count One of this Indictment are

re-alleged as if fully set forth herein.

26.     On or about December 3, 2003, within the District of Columbia and elsewhere,

defendants **ROBERT E. QUINN**, **MICHAEL H. HOLLAND**, and **MOHAMMED A.**

**SHARBAF** willfully exported and attempted to export a quantity of CMHC lift truck parts, to

wit,

> 188 PISTONS, part number 06882422 and
> 126 BRAKE LN K, part number 06181813149

from the United States to Iran, via the United Arab Emirates, without first having obtained the

required authorization from the United States Department of the Treasury's Office of Foreign

Assets Control, located in the District of Columbia, as prohibited by the ITR and the EAR.

(**Violation of the United States Iranian Embargo**, in violation of Title 50, United States Code,
Section 1705; Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 560.205;
Title 15, Code of Federal Regulations, Sections 746.7, 764.2(a), 764.2(b), 764.2(c), 764.2(e),
764.2(h), and 764.3(b)(2); and Executive Order 13222; **Aiding and Abetting and Causing an
Act to Be Done**, in violation of Title 18, United States Code, Section 2)

## COUNT SIX

27.     Paragraphs 1 through 15 and 17 through 19 of Count One of this Indictment are

re-alleged as if fully set forth herein.

28.     On or about December 18, 2003, within the District of Columbia and elsewhere,

defendants **ROBERT E. QUINN**, **MICHAEL H. HOLLAND**, and **MOHAMMED A.**

**SHARBAF** willfully exported and attempted to export a quantity of CMHC lift truck parts, to

wit,

> 112 PISTONS, part number 06882422 and
> 24 BRAKE LN K, part number 061813149

from the United States to Iran, via the United Arab Emirates, without first having obtained the

required authorization from the United States Department of the Treasury's Office of Foreign

Assets Control, located in the District of Columbia, as prohibited by the ITR and the EAR.

(**Violation of the United States Iranian Embargo**, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Sections 560.203, 560.204, 560.205; Title 15, Code of Federal Regulations, Sections 746.7, 764.2(a), 764.2(b), 764.2(c), 764.2(e), 764.2(h), and 764.3(b)(2); and Executive Order 13222; **Aiding and Abetting and Causing an Act to Be Done**, in violation of Title 18, United States Code, Section 2)

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia