IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 05-018 (JDB) |
| | : | |
| ROBERT E. QUINN and | : | |
| MICHAEL H. HOLLAND, | : | |
| | : | |
| Defendants. | : | |

GOVERNMENT'S RESPONSE TO MOTION OF
DEFENDANTS ROBERT E. QUINN AND MICHAEL H. HOLLAND
TO COMPEL IMMEDIATE DISCLOSURE OF *BRADY* MATERIAL

The defendants jointly move for the Court to compel the government to make "immediate" production of three categories of information: (1) statements made by David Tatum to government agents; (2) any information that would tend to mitigate the defendants' potential sentence upon conviction; and (3) coconspirator statements to be offered at trial under Rule 801(d)(2)(E) of the Federal Rules of Evidence (FRE).

Argument

A.    The defendants are not entitled to "immediate" production of either Jencks material or potential impeachment information, and David Tatum's statements do not constitute *Brady* information

   1. Counterstatement of facts

David Tatum was and is an executive of Clark Material Handling Corporation ("CMHC" or "Clark") in Lexington, Kentucky, who worked with defendant Quinn and for a time during the relevant period directly supervised defendant Holland. All three men had varying responsibilities for the marketing of after-market parts for Clark forklift trucks, with Mr. Tatum overseeing domestic parts marketing within the United States and Quinn assigned to international marketing.

CMHC documents – including emails – made it abundantly clear that Quinn and Holland were involve in aggressively quoting prices for, seeking to market, and in several cases actually causing shipments of U.S. to Sepahan Lifter Company ("Sepahan") in Iran, in violation of the Iran trade embargo.  Until January 2004, Tatum was unaware of these activities.

As the government will show at trial, Sepahan had long been a customer of Clark's European subsidiary, Clark Material Handling GmbH ("Clark Europe"), based in Germany, buying European-made or -inventoried Clark forklift truck components for assembly in Iran, and after-market parts to repair and maintain those trucks.  (Clark Europe's transactions with Sepahan did not violate the United States trade embargo.)  After a period of decline, Clark Europe went under in late 2002, leaving its customers – including Sepahan – without a source for parts.  At the beginning of 2003, CMHC was being rescued from bankruptcy by the Korean company, Young An Hat ("Young An"), which purchased the American company but not its European subsidiary.  In a series of meetings in Europe, beginning in January 2003, officials of CMHC sought ways to assist Clark Europe. Quinn and Tatum, in particular, addressed how to continue to keep Clark Europe customers supplied with after-market parts.  Meanwhile, Sepahan's managing director, Mohammad Sharbaf, had met Quinn and was pressing him to obtain Clark parts at favorable prices.  Throughout 2003, Quinn regularly quoted parts prices to Sepahan and even had U.S.-origin parts shipped to Sepahan, through a broker in the United Arab Emirates, in his ongoing effort to hang on to Sepahan as a customer for Clark products.

By the end of 2004, Quinn had relocated to South Korea, where he was detailed to work with Young An to build up the global business of its non-U.S. Clark acquisitions, including particularly the Korea-based Clark Material Handling Asia (CMHA).  Quinn specifically worked

on trying to market Clark forklift truck components and parts to Sepahan.[1]  In the course of that activity, Quinn sent to a Young An executive an email, dated December 21, 2003 – which the government also later found stored on Quinn's own laptop computer – advising:

> [T]here is a trade embargo between the US Government and Iran.  This is not good.  We were just prior to your negotiations trying to bring Stephan [sic] and Mr. Sharbaf back to the Clark family. . . .  [T]he CMHC Parts group can not ship to Iran.  They can not even *know* the parts are shipping to Iran.  We made the first shipment to start to bring Sharbaf back to the Clark factory.  This was done through a third party and very difficult for the customer to manage.

(Emphasis added.)

On January 12, 2004, Sharbaf sent an email to Quinn, copying Holland and David Tatum, complaining about problems getting timely shipments from CMHA, and proposing that "with suspension of trade embargo" Sepahan could purchase directly from CMHC.[2]  Evidently puzzled by the suggestion that the embargo had been lifted, Tatum emailed Holland: "Please see me before you make any further response to Sharbaf. . . . . When was the embargo lifted?"  Holland forwarded Tatum's email to Quinn, advising Quinn: "I can't find any info the the [sic] embargo being lifted."  The next day, Tatum sent an email to Quinn and Holland, stating:

> Bob, the trade embargo between the US and Iran is still in place. . . . Therefore Lexington [CHMC] should have no direct contact with Sepahan Lifter regarding

---

[1] As with Clark Europe, CMHA's transactions with Sepahan would not violate the United States trade embargo.  Although as a United States person, Quinn was prohibited by the embargo from facilitating transactions with Iran, the government has not charged him with that offense and will not refer to the violation at trial.

[2] The evidence makes it clear that Sharbaf was well aware of the United States trade embargo on Iran, which is why he had the CMHC shipment sent to him via Sharp Line Trading in Dubai, UAE.  Although Sharbaf and another Sepahan employee had been in contact with Quinn (and later Holland, too), the January 12, 2004, e-mail was the first e-mail involving the Sepahan transactions that included Tatum.  Sharbaf knew Tatum from the early '90s, when, before the 1995, CMHC was negotiating a license agreement with Sepahan.

on trying to market Clark forklift truck components and parts to Sepahan.[1]  In the course of that activity, Quinn sent to a Young An executive an email, dated December 21, 2003 – which the government also later found stored on Quinn's own laptop computer – advising:

> [T]here is a trade embargo between the US Government and Iran.  This is not good.  We were just prior to your negotiations trying to bring Stephan [sic] and Mr. Sharbaf back to the Clark family. . . .  [T]he CMHC Parts group can not ship to Iran.  They can not even *know* the parts are shipping to Iran.  We made the first shipment to start to bring Sharbaf back to the Clark factory.  This was done through a third party and very difficult for the customer to manage.

(Emphasis added.)

On January 12, 2004, Sharbaf sent an email to Quinn, copying Holland and David Tatum, complaining about problems getting timely shipments from CMHA, and proposing that "with suspension of trade embargo" Sepahan could purchase directly from CMHC.[2]  Evidently puzzled by the suggestion that the embargo had been lifted, Tatum emailed Holland: "Please see me before you make any further response to Sharbaf. . . . . When was the embargo lifted?"  Holland forwarded Tatum's email to Quinn, advising Quinn: "I can't find any info the the [sic] embargo being lifted."  The next day, Tatum sent an email to Quinn and Holland, stating:

> Bob, the trade embargo between the US and Iran is still in place. . . . Therefore Lexington [CHMC] should have no direct contact with Sepahan Lifter regarding

---

[1] As with Clark Europe, CMHA's transactions with Sepahan would not violate the United States trade embargo.  Although as a United States person, Quinn was prohibited by the embargo from facilitating transactions with Iran, the government has not charged him with that offense and will not refer to the violation at trial.

[2] The evidence makes it clear that Sharbaf was well aware of the United States trade embargo on Iran, which is why he had the CMHC shipment sent to him via Sharp Line Trading in Dubai, UAE.  Although Sharbaf and another Sepahan employee had been in contact with Quinn (and later Holland, too), the January 12, 2004, e-mail was the first e-mail involving the Sepahan transactions that included Tatum.  Sharbaf knew Tatum from the early '90s, when, before the 1995, CMHC was negotiating a license agreement with Sepahan.

quotes or sales of any kind.  Those types of discussions and negotiations should be conducted by CMHA for shipments from Korea of non-US origin material.

It is in this context in which Tatum sent to the defendants the January 16, 2003, email quoted by the defendants in their motion.  (See Defendants' Memorandum at 2)

The defendants fail to note that Quinn forwarded Tatum's email to Young An executives, along with his own notation that: "Here is the position statement from CMHC, they can not deal with Iran.  As you can see the Embargo is still in place."

The defendants also fail to note that just one day later, after the Young An executive had proposed a process for servicing Sepahan with CMHC parts through CMHA in Korea, Tatum instructed Holland to:

> please ignore KY's [the Young An executive] proposed process.  If you receive any requests for quotation direct from Sepahan do not acknowledge them, just forward to Bob Quinn's office [in Korea].

– thereby retracting his incorrect January 16th suggestion that CMHC could, to service Sepahan, "quote, ship, and bill to Sharpline" in Dubai.

Finally, the defendants fail to note that they were making exports to Iran, in knowing violation of the embargo, for several months before Tatum's January 16th e-mail and without Tatum's knowledge.  The e-mail in no way exculpates them for their earlier unlawful conduct.

 **2. The defendants are not entitled to early production
of Tatum's statements to the government**

The defendants contend that Tatum's statements to government agents contain information exculpatory to them under Brady v. Maryland, 373 U.S. 83 (1963), and they therefore must be turned over to them now.  The government takes very seriously its continuing Brady obligations, and takes this opportunity to reaffirm its commitment to make timely

disclosure of any exculpatory information that comes into its possession.

That said, the defendants' contention that Tatum's January 16th email, in isolation, demonstrates that Tatum's statements to the government are exculpatory as to either of them is clearly unfounded, and it is even less so when that email is read in context.  The government asserts that Tatum's statements to the government do not contain exculpatory material and therefore the defendants are not entitled to obtain them prematurely.  "[A] prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendants of a fair trial."  United States v. Bagley, 473 U.S. 667, 675 (1985).  The statements the defendants' seek are not such evidence.[3]

To the extent Tatum's statements may contain impeachment information under Giglio – that is, evidence that may be used to substantially impeach the credibility of a key government witness – they need only be produced in sufficient time for the defendants to make effective use of them at trial.  The government has already agreed to turn over its Jencks material, including witness statements, one week before trial, and submits that this is ample time for that purpose as well.

It is important to note that the defendants have long had all of the emails cited above – and, indeed, all the documentary evidence in the government's possession as well as their own independent access to CMHC records.  Moreover, defense counsel have had access to Mr. Tatum himself, and they interviewed him (and numerous other CMHC employees) earlier this summer.[4]

---

[3] The government is of course prepared to tender the statements to the Court for *in camera* review.

[4] Notwithstanding CMHC's ongoing cooperation with the government, the company has opened its records to the defense team, and has made employees available to the defense for

They presumably know what he is going to say.

B. **The government is not required to make pretrial disclosure of information that would tend to mitigate the potential sentence the defendants would face upon conviction**

The defendants contend that Brady compels in this case the pretrial production of information "that would tend to mitigate the potential sentence" they would receive upon conviction.[5] The Brady decision implicated such pretrial production because it was a capital case, and such is not the circumstance here.

Specifically, the defendants have requested:

> any information that other individuals or companies who allegedly violated the export control laws by conducting business with individual [sic] or companies in Iran or other embargoed nations have been permitted to dispose of their liability with a civil settlement with the government rather than face a criminal prosecution, or have been permitted to plead guilty pursuant to a plea agreement that resulted in a non-custodial criminal sentence.

(Letter from Defense Counsel to the Government, at 3, attached to defendants' Memorandum at Exhibit D.) What this amounts to is nothing less that a demand that the government serve as the defense team's research arm to gather already publicly-available information, as well as a claim of entitlement to a wholesale disgorgement of the United States government's historical enforcement of its export embargo laws. Even if such information were relevant to sentencing (and the government does not concede that it is), it is not something to which the defendants are

---

interviews.

[5] They seek: "All information that could have the effect of reducing the Sentencing Guidelines calculation for [the defendants] or support a downward departure or reduce the sentence within the Guidelines range, or support a sentence below the applicable Guidelines range because of the factors set forth in 18 U.S.C. §3553(a) or otherwise tend to mitigate the severity of the sentence." (Letter from Defense Counsel to the Government, at 3, attached to defendants' Memorandum at Exhibit D.)

entitled until after they have been found guilty and the question of their sentencing is in issue.[6] Neither Brady nor Rule 16 of the Federal Rules of Criminal Procedure, nor any of the cases cited by the defendants require the premature and broad production the defendant seeks, and the government submits the Court neither can nor should order it.

**C.  The defendants are not entitled to pretrial production of coconspirators' statements**

Finally, the defendants seek pretrial production of coconspirators' statements, in furtherance of the defendants' conspiracy, that the government intends to introduce at trial, and they seek it for the purpose of litigating, prior to trial, the existence of a conspiracy.[7] Neither law, nor practice in this District, nor good common sense support either such a pre-trial "mini-trial" nor the corresponding production.[8]

The vast bulk of evidence against the defendants in this case is documentary, and the government's documentary evidence has long since been produced to the defendants, such that they well know that the government has ample proof of the existence of the conspiracy. The defendants themselves acknowledge in their Memorandum in support of this Motion that their request amounts to a demand for a pre-trial evidentiary hearing at which the government would

---

[6] The government recognizes that sometimes information pertaining to sentencing factors might be relevant to a defendant's decision to plead guilty. In this case, however, neither defendant has requested a plea offer from the government.

[7] Although enfolded into their Brady motion, this section is (properly) not asserted under Brady or other related law.

[8] See United States v. Gantt, 617 F.2d 831, 845 (D.C. Cir. 1980); United States v. Jackson, 627 F.2d 1198, 1218 (D.C. Cir. 1980); United States v. Edelin, 128 F. Supp.2d 23, 45-46 (D. D.C. 2001) (Lamberth, J.) ("A hearing to make an advance determination of conspiracy is unnecessary for the Court's determination by a preponderance of the evidence that a conspiracy existed.").

be required to present testimony of one particular witness – cooperating coconspirator Khalid Mahmood – and to subject him to a pre-trial cross examination.  Such a proceeding would be wholly duplicative of Khalid Mahmood's testimony – on direct and cross – at trial, and is therefore utterly wasteful of the Court's and the parties' resources.  It would, moreover, substantially disadvantage the government, which already bears the high and final burden of proof in the case, by requiring the government to enable the defendants, through counsel, to "pre-test" their cross-examination of Khalid Mahmood before having to question him before the jury at trial.  Such a procedure is simply not provided for in our system's rules of engagement.

In the alternative, the defendants ask that the Court require the government to "promptly produce" to them a list of coconspirator statements it plans to introduce at trial.  There is no rule or law in this Circuit contemplating such pretrial production, and the defendants do not even suggest there is.   The government has no such discovery obligation, and the Court should accordingly deny the defendants' attempt to impose one.

**Conclusion**

For all the foregoing reasons, the government submits that the Motion of Defendants Robert E. Quinn and Michael H. Holland to Compel Immediate Disclosure of *Brady* Material should be denied.

                                         Respectfully submitted,

                                         KENNETH L. WAINSTEIN
                                         D.C. Bar No. 451058
                                         United States Attorney

By:            /s/
              LAURA A. INGERSOLL
              Assistant United States Attorney
              Connecticut Bar No. 306759
              (202) 514-9549
              laura.ingersoll@usdoj.gov

              /s/
              JAY I. BRATT
              Assistant United States Attorney
              Illinois Bar No. 6187361
              (202) 353-3602
              jay.bratt@usdoj.gov

              Transnational and Major Crimes Section
              555 4th Street, N.W. – 11th Floor
              Washington, D.C.  20530

**Certificate of Service**

I, Jay I. Bratt, certify that I caused to be served a copy of the foregoing Government Response to Motion of Defendants Robert E. Quinn and Michael H. Holland for Supplemental Juror Questionnaire, by electronic means on all counsel of record for defendants Quinn and Holland this 22nd day of September, 2005.

/s/
Jay I. Bratt