UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

ROBERT E. QUINN,

Defendant.

Criminal No.  05-0018 (JDB)

## MEMORANDUM OPINION

Currently pending before the Court is defendant Robert Quinn's motion for a new trial filed pursuant to Federal Rule of Criminal Procedure 33.  Quinn moves for a new trial contending: (1) that the government suppressed material evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and (2) that the government allowed false testimony of a witness to go uncorrected in violation of Napue v. Illinois, 360 U.S. 264 (1959).  Upon careful consideration of the motion, the parties' memoranda, the arguments advanced at the motions hearing held on December 11, 2007, the applicable law, and the entire record, this Court finds that the government's conduct violated Quinn's due process rights and severely prejudiced him.  This conclusion is not easily reached, but viewing the trial in its totality, the Court has grave concerns about the fairness of the proceedings and determines that defendant Quinn did not receive a verdict worthy of confidence.  Accordingly, in response to the D.C. Circuit's inquiry, this Court certifies that it intends to grant Quinn's motion for a new trial.

## BACKGROUND

### I.     Procedural History

Quinn was charged by superseding indictment with conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371, and with five counts of violating the United States Iranian Trade Embargo.  See 50 U.S.C. § 1705(b) (establishing penalties for "[w]hoever willfully violates, or willfully attempts to violate, any license, order, or regulation issued under this chapter"); 31 C.F.R. § 560.204 (providing that "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited").  Michael Holland, who was tried with Quinn, was charged with conspiracy and three counts of violating the embargo.  Because there were no direct shipments made to Iran from Quinn's employer, Clark Material Holding Company ("CMHC"), the prosecution focused on indirect shipments of forklift replacement parts from CMHC through a third party to Iran.

At trial, Quinn conceded that he had participated in indirect shipments.  The defense theory, however, was that Quinn was not guilty of the indicted charges because he did not know that indirect shipments to Iran were illegal and thus had not "willfully" violated the embargo.  In fact, Quinn insisted that his direct supervisor at CMHC, David Tatum, had approved of the indirect transactions.  On December 7, 2005, after six days of testimony, the jury found Quinn guilty on all counts but acquitted Holland on all counts.  Two-and-a-half months later, Quinn was sentenced to 39 months imprisonment and two years of supervised release.  On February 28, 2006, the Court granted Quinn's motion under 18 U.S.C. § 3143(b)(1) for bail pending appeal, and on March 1, 2006, he appealed his conviction.

Approximately two months later, on May 4, 2006, David Tatum, Quinn's direct supervisor, pled guilty to making a material false statement in violation of 18 U.S.C. § 1001 during the government's investigation of possible embargo violations at CMHC.  Specifically, Tatum admitted that he had lied when he "stated to OEE [Department of Commerce Office of Export Enforcement] and ICE [Department of Homeland Security Immigration and Customs Enforcement] agents that, after learning of Quinn's and Holland's dealing with [the Iranian company], he had instructed them to cease sending CMHC replacement parts to [the Iranian company] either directly or through a third party."  Gov't Ex. I ¶ 8 (emphasis added).  In light of this information, counsel for Quinn represented to the D.C. Circuit at oral argument on his appeal that he planned to file a motion in this Court requesting a new trial.  United States v. Quinn, 475 F.3d 1289, 1290 (D.C. Cir. 2007).  Defendant's appeal was therefore held in abeyance pending further proceedings before this Court on defendant's anticipated Rule 33 motion.[1]

## II.    Time Line of Events

Consideration of Quinn's Rule 33 motion requires a close analysis of the government's decision-making at various points in time.  Therefore, this summary reviews the relevant events in the order in which they transpired.  In December 2004, agents of OEE and ICE executed a search warrant in Lexington, Kentucky, at Clark Material Holding Company, which manufactures forklifts and industrial equipment.  See Def.'s Ex. B at 671.  During the search, David Tatum, Vice-President of CMHC's Parts Operations and Quinn's direct supervisor, told the agents that he was aware of the prohibitions against shipments to Iran and that he understood that

---

[1]As noted by the Court of Appeals, if this Court indicates an intention to grant a new trial, the case may then be remanded (upon motion by Quinn) to this Court by the Court of Appeals. See 475 F.3d at 1290-91.

shipments through an intermediary company, for ultimate destination to Iran, were illegal.  See Def.'s Ex. D at 1-2.  Tatum also stated that Quinn had sought his advice regarding product requests from an Iranian company, and that Tatum had instructed Quinn that such requests had to be rejected due to the U.S. trade embargo against Iran.  See id. at 2.

Special Agent Scott Douglas relied on Tatum's statements and used them to obtain an arrest warrant for Quinn.  Specifically, Douglas stated in his affidavit in support of the arrest warrant that Tatum had informed agents that "some time in or around 2002 or 2003, Quinn and Holland consulted him concerning inquiries for parts from [an Iranian company].  After researching the issue, the executive [Tatum] informed both Quinn and Holland that Clark MHC could not fill any orders from [the Iranian company] because of the embargo against Iran."  Def.'s Ex. F at 10.  During 2005, the government continued to rely on Tatum as a source of information and as a potential witness for trial.  At a proffer session with the government, Tatum stated that he had instructed Quinn and Holland "to cease sending CMHC replacement parts to [the Iranian company] either directly or through a third party."  Gov't Ex. I ¶ 8 (emphasis added).

Quinn consistently maintained that Tatum had lied to the government during the course of its investigation.  Specifically, Quinn and his counsel repeatedly told the government that Tatum had never informed Quinn that indirect shipments to Iran were illegal.  See Def.'s Ex. H at 104:9-14 ("The defense at trial, it's not a secret, Your Honor.  Our defense is that these two men didn't know that indirect shipments were illegal.  The purported statement that David Tatum -- this purported warning that he made to Mike Holland and Bob Quinn directly rebuts that.  We don't believe that that statement ever happened . . . .").  To the contrary, Quinn maintained that Tatum had approved the indirect shipments through a company located in the United Arab Emirates.

Quinn argued in his motion to compel immediate disclosure of <u>Brady</u> material that "far from warning Quinn and Holland about the illegality of the transactions at issue, which allegedly were transshipped to Iran by [a company in] Dubai, Mr. Tatum endorsed the sales as being consistent with U.S. law."  Def.'s Ex. I at 2 (citing Tatum's January 16, 2004 e-mail to Quinn and Holland). Nevertheless, the government firmly maintained its position that Tatum was truthful and that the government planned to call Tatum as a witness at Quinn's trial.

Because the primary contested issue at trial was going to be whether Quinn knew that indirect shipments to Iran were illegal, and because Tatum was the only potential witness who claimed he had directly warned Quinn of the illegality of his actions, Quinn always insisted that Tatum was going to be the government's most important witness.  <u>See, e.g.</u>, Def.'s Reply Ex. C at 106:19-20 (Quinn's counsel describing Tatum as "the critical prosecution witness").  The government reinforced the expectation that Tatum would be called as a witness when it provided Quinn with Jencks Act (18 U.S.C. § 3500) material for Tatum two weeks before trial and when it listed Tatum as a witness during voir dire of the jury panel.  <u>See</u> Def.'s Reply Ex. D at 22:24.

On November 25, 2005, upon review of Quinn's proposed trial exhibits, the government saw Tatum's January 13, 2004 e-mail, which the government had not previously reviewed on its own -- even though the government had in fact produced this document in discovery.  <u>See</u> Decl. of Jay I. Bratt ("Bratt Decl.") ¶ 3; Decl. of Laura A. Ingersoll ("Ingersoll Decl.") ¶ 4; Decl. of Scott D. Douglas ("Douglas Decl.") ¶ 3.  In the January 13th e-mail, regarding parts to be shipped to Dubai, Tatum told Quinn that he would advise him of the revised price level so that Quinn could pass that information on to the "enduser," presumably the Iranian company.  <u>See</u> Gov't Ex. B at 39.  After reviewing this e-mail, the government decided not to call Tatum as a witness.  In

an internal memorandum, the government admitted that it had become "more and more concerned that Tatum was not being truthful" and that the January 13th e-mail "when laid on top of the other emails broke the Tatum-camel's back."  Gov't Ex. H at 1.  Hence, on November 27, 2005 -- the day before opening statements were given -- the government faxed a letter to Tatum's counsel.  The letter stated in part that "[t]his is to advise you that, based upon evidence that has come to the government's attention in the past few days, the government no longer considers Mr. Tatum to be merely a witness in the matter of Iran embargo violations by" CMHC and, "accordingly, we do not intend to call Mr. Tatum as a witness" at Quinn and Holland's trial. Gov't Ex. F at 1.

But neither Quinn, Holland, nor their attorneys were informed of this significant change in the government's assessment of Tatum, of the change of Tatum from a witness in to a target of the investigation, or of the fact that Tatum would not be called as a trial witness.  Because Quinn did not have this information, his counsel devoted a significant portion of his opening to impeaching Tatum's credibility in the expectation that Tatum would be taking the stand as a critical government witness.  The government did not inform Quinn of its decision not to call Tatum as a witness until two days later, on the evening of November 29, 2005, after opening statements had been given and after several witnesses had presented testimony.  See Def.'s Reply Ex. A at 577:20-23.  When the government informed Quinn, it gave no explanation as to why it was no longer going to call Tatum.  Quinn then promptly attempted to subpoena Tatum as a defense witness, but Tatum refused to testify without use immunity.  The government declined to give immunity, and Quinn thereafter unsuccessfully requested this Court to compel the government to immunize Tatum.  See Def.'s Ex. B at 748:2-13.

During the trial, counsel for Quinn walked Douglas though a line of questioning on cross-examination in an attempt to get at contradictory information Tatum had given that was left out of Douglas' affidavit in support of Quinn's arrest warrant.  During that exchange, Douglas volunteered that he had "statements from Mr. Tatum that said he had advised Mr. Quinn and Mr. Holland not to ship to Iran." Id. at 824:10-12.  The Court interrupted Douglas to prevent non-responsive or inadmissible testimony, but the Court declined to strike his previous statement from the record.  See id. at 824:20-21.[2]  At the conclusion of the trial, Quinn was found guilty on all counts, but Holland was acquitted on all counts against him.

Although the government had all of the information it needed in November 2005 -- before Quinn's trial -- to make an initial determination about Tatum's culpability (since it concluded that Tatum was a target of the investigation and was not a credible witness for the government), it took the government until March or April 2006 to specifically identify the false statement charge it ultimately brought.  The government concedes that it had all of the relevant information in November 2005, but it did not take the time to investigate its suspicions about Tatum more fully until well after Quinn's trial had ended.  AUSA Jay I. Bratt and AUSA Laura A. Ingersoll met on January 24, 2006, to discuss how to proceed regarding Tatum, and in early February 2006 they had discussions with Tatum's counsel.  See Bratt Decl. ¶¶ 7, 8; Ingersoll Decl. ¶ 9.  During those discussions, the government mentioned the possibility of a plea, with a false statement charge as a potential basis for the plea.  See Bratt Decl. ¶ 8.  Quinn's sentencing had not yet occurred, but none of this information was disclosed to Quinn or his counsel.  Quinn

_____

[2]At the time, neither Quinn's counsel nor the Court knew what the witness (Douglas) and the prosecutors knew -- that the government had decided not to call Tatum because it doubted his veracity regarding what he had advised Quinn and Holland.

-7-

was sentenced on February 23, 2006.  Although it was clear that he, and the Court, were focused

on assessing sentences others had received for similar conduct in order "to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct," 18 U.S.C. § 3553(a)(6), the government gave no indication that it was close to

charging Tatum for conduct arising from the same events and that a plea could very well result in

a sentence of no incarceration.

On April 17, 2006, the government circulated an internal memorandum requesting

authorization to extend a plea agreement to Tatum.  See Gov't Ex. H.  In that memorandum, the

government stated that "the muddiest issue in this case has been the state of knowledge of the

defendants and others at Clark regarding the applicability of export control laws to indirect

exports."  Id. at 1.  The government admitted that in several e-mails Tatum indicated to Quinn

that he could "service the [Iranian] client through [the Dubai company] in the United Arab

Emirates."  Id. at 2.  The government therefore believed that the facts supported "a false

statement charge based on his insistence that whenever the issue came up Tatum directed

'everyone concerned' -- mainly Quinn and Holland -- to halt any transactions destined for [Iran]."

Id.  On May 4, 2006, Tatum pled guilty to making a false statement, and he was subsequently

sentenced to probation for twelve months.  See Def.'s Ex. A at 10:3-5.

## STANDARD OF REVIEW

Under Fed. R. Crim. P. 33(a), a court "may vacate any judgment and grant a new trial if

the interest of justice so requires;" the grant or denial of a motion for a new trial is committed to

the sound discretion of the trial judge.  See United States v. Kelly, 790 F.2d 130, 133 (D.C. Cir.

1986); United States v. Mangieri, 694 F.2d 1270, 1285 (D.C. Cir. 1982).  Generally, a defendant

must satisfy a five-part test to obtain a new trial based on newly discovered evidence: "(1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal." United States v. Lafayette, 983 F.2d 1102, 1105 (D.C. Cir. 1993) (citing Thompson v. United States, 188 F.2d 652, 653 (D.C. Cir. 1951)).  The five-part test does not apply, however, when a defendant alleges that the original trial was marred by a Brady or Napue violation.  See, e.g., Kelly, 790 F.2d at 135 (noting that "the usual standards for a new trial are not controlling because 'the fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial'") (quoting United States v. Agurs, 427 U.S. 97, 111 (1976)).

Under Brady, the government is required to disclose information in its possession that is material to an accused's guilt or punishment.  Brady v. Maryland, 373 U.S. 83, 87 (1963); United States v. Hemphill, No. 06-3088, slip op. at 16 (D.C. Cir. Feb. 8, 2008).  To prevail on a motion for a new trial on the basis of a Brady violation, a defendant must establish the materiality of the suppressed evidence to demonstrate that prejudice ensued.  "Evidence is material if the undisclosed information could have substantially affected the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict," United States v. Oruche, 484 F.3d 590, 597 (D.C. Cir. 2007), or "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," United States v. Bagley, 473 U.S. 667, 682 (1985); see also Kyles v. Whitley, 514

U.S. 419, 433 (1995).  "The Supreme Court has emphasized that the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  Oruche, 484 F.3d at 596-97 (quoting United States v. Cuffie, 80 F.3d 514, 517 (D.C. Cir. 1996)).

In Napue v. Illinois, the Supreme Court reinforced the principle, "implicit in any concept of ordered liberty," "that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction."  360 U.S. 264, 269 (1959).  Accordingly, under Napue and its progeny, a conviction must be set aside and a new trial granted "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  Agurs, 427 U.S. at 103; see also United States v. Gale, 314 F.3d 1, 3 (D.C. Cir. 2003).  To prevail on this claim, a defendant must show "that false testimony was presented at trial, and that the government knew, or should have known, that the testimony was false."  United States v. Price, 357 F. Supp. 2d 63, 69 (D.D.C. 2004); see also United States v. Fields, 2006 WL 148739, at *2 (D.D.C. Jan. 18, 2006).

## DISCUSSION

**I.     The Brady Claim**

A Brady violation is comprised of three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999).  Although the government desires a restrictive interpretation of its Brady obligations here, "courts have used the term 'Brady

violation' to cover a multitude of prosecutorial sins involving breach of 'the broad obligation to disclose exculpatory evidence,' often called 'Brady material.'" In re Sealed Case No. 99-3096 (Brady Obligations), 185 F.3d 887, 892 (D.C. Cir. 1999) (quoting Strickler, 527 U.S. at 281). Notably, this broad obligation "include[s] both the failure to search for Brady material and the failure to produce it." Id. Because a Brady violation may occur "irrespective of the good faith or bad faith of the prosecution," Brady, 373 U.S. at 87, "the prudent prosecutor will resolve doubtful questions in favor of disclosure," Agurs, 427 U.S. at 108. See also United States v. Morrow, 412 F. Supp. 2d 146, 158 (D.D.C. 2006) (stating that the government "must bear in mind that it has the 'affirmative duty to resolve doubtful questions in favor of disclosure'") (quoting United States v. Blackley, 986 F. Supp. 600, 607 (D.D.C. 1997)).

The timing of the government's disclosure is also relevant in evaluating an allegation of a Brady violation. Proper timing may involve a delicate balancing, but the government must disclose Brady information "at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure." United States v. Pollack, 534 F.2d 964, 973 (D.C. Cir. 1976). Because "[t]he prosecutor's obligation to disclose material information to the defense is a fundamental component of the guarantee that criminal defendants receive fair trials," a Brady violation is not taken lightly. United States v. Smith, 77 F.3d 511, 517 (D.C. Cir. 1996).

Quinn argues that his guarantee of a fair trial was usurped by the government's failure to disclose information that he was entitled to receive under the strictures of Brady. Specifically, this Court must analyze three incidents of the government's alleged failure to disclose information. Two occurred at trial: the government's failure to inform Quinn that Tatum had

-11-

made false statements on the key issue of whether he had advised Quinn that indirect shipments

to Iran were illegal, and the government's failure to inform Quinn before trial began that it would

not be calling Tatum as a witness because he was now a target of the investigation.  The third

relates to Quinn's sentencing: the government's failure to inform Quinn of the ongoing plea

discussions with Tatum.

### A.      The Government's <u>Brady</u> Violations At Trial

As is apparent from the descriptions above, Quinn's <u>Brady</u> claim focuses on information

relating to Tatum -- to whom the government concedes its <u>Brady</u> obligations extended.  <u>See</u>

Transcript of Dec. 11, 2007 Motions Hearing ("Mot. Hr'g Tr.") at 60:19-21; 66:18-24.  The

threshold inquiry in the analysis of this issue, then, is whether this information -- the

government's state of knowledge regarding Tatum's false statements and its withdrawal of Tatum

as a witness based upon his reclassification as a target -- is "favorable to the accused" and hence

within the scope of <u>Brady</u>.  Plainly, the answer is yes -- the information withheld went to the

heart of Quinn's defense.  This information would have helped to corroborate Quinn's position

that Tatum was culpable and had implicated Quinn to protect himself, that Quinn believed

indirect shipments to Iran were legal based upon the fact that his supervisor, who was supposed

to be knowledgeable in international trade regulations, had approved such transactions, and that

the government's investigation had been misdirected by a dishonest informant.

Tatum was to be the only witness who would testify that he warned Quinn of the illegality

of indirect shipments.  This testimony would directly rebut Quinn's claim about his state of mind

or knowledge.  Thus, information indicating that Tatum had lied in incriminating Quinn was

certainly relevant to a central issue and favorable to the defense.  <u>See, e.g.</u>, <u>Cuffie</u>, 80 F.3d at

-12-

517-18 (noting that the government's failure to disclose "evidence that [a witness] had lied under oath in a previous court proceeding involving the same drug conspiracy" was a violation of Brady). In fact, the government itself concedes that when it has information about a witness who it is planning to call in its case in chief that indicates the witness has lied to the government about material matters during the course of the investigation, that information is Brady material. See Mot. Hr'g Tr. 66:25-67:7. Here, then, information that Tatum, Quinn's supervisor (who was labeled the "critical" government witness), had lied to investigators about advising Quinn that indirect shipments to Iran were illegal would surely be material to Quinn's guilt and hence Brady information.

The government agrees that it was planning to call Tatum to testify in its case in chief, and concedes that it had information that indicated Tatum was not truthful about material matters during the course of the investigation. Of course, not only was the government planning to call Tatum, as it had consistently indicated to the defense, but Quinn and his counsel viewed Tatum as the "critical" government witness. The government argues, however, that nothing was suppressed at Quinn's trial or sentencing because it did not know with absolute certainty at that time that Tatum had lied. In this case, the Court finds this response to be insufficient. Quinn was misled and left with the incorrect perception that he alone doubted Tatum's credibility. For months he had argued that Tatum had lied to the government during its investigation, and the government accepted no part of his argument. Quinn had no way of knowing that on the eve of trial the government had suddenly changed its position -- which would thoroughly change the manner in which he could assert his defense at trial. Nor did Quinn even know that the government would not be calling Tatum as a witness, and thus his counsel was left to formulate

-13-

the defense theme and opening statement on the erroneous belief that the "critical" government witness would be appearing.

Because the government had not identified a particular statement by Tatum that was false, the government's argument goes, there was nothing the government was obligated to tell Quinn.  The government maintains that "[i]mmediately before Quinn's trial, the prosecutors developed concerns about Tatum's credibility, but at Quinn's trial and at his sentencing, they had not yet reached a decision about Tatum's culpability."  Gov't Opp. at 3; see also Gov't Opp. at 29 ("the prosecutors and the agent viewed Tatum with a generalized suspicion, but they had not made any particularized determination about his culpability or his candor"); Bratt Decl. ¶ 4 ("AUSA Ingersoll and I now determined that the January 13, 2004 e-mail caused us sufficient doubts about Tatum's credibility that we could not call him as a witness during the Quinn trial."); Ingersoll Decl. ¶ 5 ("the newly-discovered (by us) January 13, 2004 e-mail led AUSA Bratt and me to have sufficient doubts about Tatum's credibility that we decided not to call him as a trial witness").  The government goes to great lengths to explain that it did not in fact identify a statement by Tatum to support a false statement charge until several months after Quinn's trial and about one month after Quinn's sentencing.  But this timing does not carry the day for the government.

The government's strained dichotomy between "knowing" and being "highly suspicious" constitutes no excuse here since the failure to pinpoint a precise statement that would support a false statement charge was due to the lack of timely investigation by the government -- an action that "constituted a breach of the government's 'duty to search' for Brady information."  In re Sealed Case No. 99-3096, 185 F.3d at 898.  The government did not act before trial to pinpoint

-14-

with accuracy the time and date of Tatum's contradictory statements, and the government cannot shield itself from its <u>Brady</u> obligations by willful ignorance or failure to investigate.  From the very beginning of this prosecution, Quinn maintained that Tatum had approved of the indirect shipments to Iran and that Tatum had lied to the government in making any statements to the contrary.  Quinn asserted this position again and again to the government to no avail.  His motion to compel disclosure of <u>Brady</u> material specifically argued that "far from warning Quinn and Holland about the illegality of the transactions at issue . . . Mr. Tatum endorsed the sales as being consistent with U.S. law." <u>See</u> Def.'s Reply Ex. I at 2.  And at a motions hearing more than a month before trial, Quinn asked for material on Tatum to "figure out how he apparently metamorphosed from saying one thing to the agents in December 2004, saying other things later, and how that is contradicted by the whole corpus of documentary evidence in this case."  Def.'s Reply Ex. C at 106.  Thus, Quinn did all he could reasonably do to highlight Tatum's contradictory testimony for the government's attention.  Nevertheless, the government, even once on notice of a serious issue regarding his truthfulness, made no pre-trial effort to review the Tatum materials and assess his truthfulness or culpability further.

Just days before trial was to commence, the government reviewed Tatum's January 12, 2004 e-mail and came to the realization that Quinn's argument might have merit -- i.e., that Tatum might not have been truthful on a key point.  When the government was confronted with this situation that indicated the defense was correct about Tatum, the government turned a blind eye to the evidence, or at the very least, made a conscious decision that the information need not be pursued further or disclosed to Quinn for his trial.  <u>See, e.g.</u>, Bratt Decl. ¶ 4 ("AUSA Ingersoll and I further agreed that any decision about how to resolve Tatum's liability in this matter would

-15-

have to wait until the trial of Quinn and Holland concluded, given the demands that trying the case placed on us."); Bratt Decl. ¶ 5 ("After seeing defendants' Exhibit 398, I did not examine the agents' reports of our interviews with Tatum to determine which of his statements to the government were inconsistent with the exhibit or to otherwise assess his culpability."); Bratt Decl. ¶ 6 (explaining that he did not review Tatum's statements immediately after Quinn's trial but instead attended to other matters and went on leave); Ingersoll Decl. ¶ 6 ("After discovering Defense Exhibit 398 and making our decision about Tatum's status, AUSA Bratt and I devoted our full attention to the Quinn case trial and had no time to further pursue the issue of Tatum's potential criminal liability, or even meet with him or his counsel to discuss the matter."); Ingersoll Decl. ¶ 8 ("After the Quinn trial ended with a verdict on December 7, 2005, I did not immediately turn to the Tatum matter.").

The government should have been sufficiently familiar with Tatum's statements (through trial preparations and the intention of calling him as a witness) to realize then that he had lied about material matters during the course of the investigation.  Thus, the government should have disclosed this realization to the defense -- even if a precise false statement for prosecution had not yet been identified.  This is especially true given that Tatum was, at least in Quinn's view, a critical witness in the case.  To the extent that the government argues that it had no obligation to pursue this matter beyond its suspicions in light of the impending trial, the government is incorrect.  The D.C. Circuit has previously rejected government complaints "that 'in the midst of the trial' it should not have been required to 'scamper' about searching for the requested evidence."  In re Sealed Case No. 99-3096, 185 F.3d at 895.  In rejecting this argument, the court noted that because the defendant had raised his arguments for the information "early, often,

-16-

insistently, and with specificity," the government could have conducted such a search at a much earlier date.  Id.  If the government still had to "scamper" around during trial to collect the requested Brady material, "it had no one to blame but itself."  Id.  So too here, the government had no one to blame but itself for not thoroughly investigating Tatum's credibility at an earlier date based upon Quinn's constant insistence that Tatum's statements were false.  As the Court noted during oral argument, it is sad and unacceptable for the government to prepare for and conduct a trial seemingly disregarding the primary defense theory.  See Mot. Hr'g Tr. 23:25-24:3.  To neither pursue nor disclose to Quinn the information and concerns regarding Tatum's truthfulness -- once those concerns reached the level that Tatum had become a target of the investigation and would not be called to testify -- was a decision the government made knowing that Tatum was viewed by Quinn as critical both to the prosecution's case and to Quinn's defense.  The government's decision to do nothing vis-a-vis Quinn was made even though the government had concluded before trial began that Tatum was a target and would not be called as a witness at trial, and had so informed Tatum's counsel.

The Court does not doubt the veracity of the declarations attached to the government's opposition, which indicate that the government did not settle on a precise and chargeable false statement by Tatum until March or April 2006.  But the Court finds that even without further investigation the government's information nonetheless had sufficiently crystallized as of November 27, 2005, to implicate its Brady, or more general due process, obligations.  On that date, the day before the trial began, the government sent a letter to Tatum's counsel stating that Tatum was no longer "merely a witness" and that the government would not be calling him to testify in Quinn's trial.  See Gov't Ex. F.  Both AUSAs state that they viewed Tatum as a target of

-17-

the investigation at that time.  See Bratt Decl. ¶ 4 ("We also concluded that Tatum's status had

changed from being a witness in the case to being a target of the investigation, and on Sunday,

November 27, 2005, we sent a letter to this effect to Tatum's counsel."); Ingersoll Decl. ¶ 5 ("On

November 27, 2005, the day before opening statements were given and the government began

presenting its case, we faxed a letter to Tatum's counsel advising that Tatum's status was as a

target and that we would not be calling him to testify.").  Obviously, when the government

reviewed the evidence on the eve of trial, something resonated with the government that Tatum

had been untruthful in his statements, given that a single e-mail "broke the Tatum-camel's back

and moved him out of the mere-witness category."  Govt' Ex. H at 1.

Although Tatum was now a target of the investigation and would not be called as a

witness (notwithstanding that he was viewed as "critical" by the defense), and although Tatum

was so informed, the government chose not to inform Quinn.  The D.C. Circuit has concluded

that withholding such information constitutes a Brady violation.  See United States v. Bowie, 198

F.3d 905, 909 (D.C. Cir. 1999).  In Bowie, when a police officer testified at a defendant's trial, he

was already the subject of an investigation regarding the truthfulness of his testimony given in a

previous matter.  Id. at 908.  Neither the prosecutor nor the police officer were aware of the

investigation at the time of the defendant's trial.  Thus, the information was not disclosed to the

defendant.  When the prosecutor learned of the investigation days after the defendant was

convicted, she sent a letter to inform defense counsel, and defense counsel responded with a

motion for a new trial.  The D.C. Circuit concluded that "[t]he government's nonfeasance is clear

enough.  The prosecution had a duty, under Brady, to provide defense counsel with the evidence

[that the police officer was under investigation] before trial and it failed to carry out its duty."  Id.

at 909.  Here, remarkably enough, not only were the prosecutors aware that Tatum was under

investigation for possibly giving false statements critical to the case, but they were the ones who

had him under investigation.  The government had no excuse for withholding this information

from Quinn, and its decision to do so violates its Brady duty of disclosure.  See United States v.

Wang, 1999 WL 138930, at *52 (S.D.N.Y. Mar. 15, 1999) (dismissing indictment where the

government failed to inform the defense until one week before trial that it would not be calling a

witness whose credibility was now in doubt by the government).  And it is not enough to suggest

that there is no Brady violation because the government did not call Tatum and the defense could

have.  Here, certainly the prosecutors knew that Quinn viewed Tatum as a key government

witness and had every reason to believe the government's representation that he would be called.

And just as surely, the government knew Quinn could not get Tatum to testify for the defense at

such a late date and with the government declining to provide immunity.

   The question then remains as to prejudice.  See Oruche, 484 F.3d at 597 (noting that "in

regard to an asserted Brady violation the question is whether the failure to disclose significantly

undermined the fairness of the verdict").  The government argues that Quinn was not prejudiced

because "strong" evidence of his guilt remains -- regardless of his inability to present evidence

related to Tatum's untruthfulness and the government's awareness of it.  Gov't Opp. at 31.  The

government points to a December 21, 2003 e-mail, alleged false statements made by Quinn to

Douglas, and allegations that Quinn was secretive about his success in shipping indirectly to Iran.

But this line of inquiry is irrelevant in evaluating prejudice under Brady.  The proper focus for

the Court "is on the 'potential impact that the undisclosed evidence might have had on the

fairness of the proceedings' rather than on the overall strength of the government's case."  Cuffie,

80 F.3d at 517-18 (remanding for a new trial based on a <u>Brady</u> violation even though "the

remaining evidence standing alone would have been sufficient to convict") (citation omitted); <u>see</u>

<u>also</u> <u>Smith</u>, 77 F.3d at 515 ("As the Court made clear in <u>Kyles</u>, the test for materiality is not a

sufficiency-of-the-evidence test."); <u>United States v. Lloyd</u>, 71 F.3d 408, 411 (D.C. Cir. 1995).[3]

Hence, the Court turns to an analysis of the prejudice asserted by Quinn.  He contends

that without the suppressed information he was: (1) unable to call Tatum as a witness; (2) unable

effectively to impeach and undermine the credibility of key government witnesses, particularly

Special Agent Douglas; and (3) unable to alter his defense strategy to attack the integrity of the

government's investigation.  Based on contentions (2) and (3), the Court concludes that the

undisclosed information impacted the fairness of the proceedings to such an extent that a new

trial is warranted.

At the time of opening statements and during presentation of the government's first

witnesses, Quinn reasonably believed, based on the government's representations, that Tatum

would be testifying.  Because Tatum was the only person who supposedly had told the

government that he warned Quinn about the illegality of shipping indirectly to Iran, Quinn had

consistently informed the government and the Court that he viewed Tatum as the "critical

prosecution witness."  Def.'s Reply Ex. C at 106:19-20.  Quinn argues that if the government had

_____

[3]The government also contends that because Quinn "failed to satisfy the more defense-
friendly standard of materiality" under <u>Napue</u>, "Quinn has necessarily also failed to meet the
stricter standard" of prejudice under <u>Brady</u>.  Gov't Opp. at 36 (citation omitted).  But this
argument, too, is unavailing.  The <u>Napue</u> and <u>Brady</u> claims assert different allegations.
Resolution of the <u>Napue</u> claim turns on an analysis of Douglas' statement, and that determination
in no way limits this Court in reviewing the government's <u>Brady</u> violations and their impact on
the fairness of Quinn's trial.

promptly informed him of its decision not to call Tatum because of his possible false statements, Quinn would have had more time to take action to secure Tatum's presence at trial.  The Court is unconvinced, however, that disclosure of the <u>Brady</u> information a few days earlier would have had an impact on Quinn's access to Tatum's testimony at trial.  Once the government informed Tatum that he would not be called as a witness because he had been moved out of the witness and into the target category, Tatum indicated that he would assert his Fifth Amendment right against self-incrimination if called by the defense.  There is no reason to believe that Tatum would have had a different response if Quinn had been informed a few days earlier.

Quinn also argues that if he had been aware of the government's position he "could have made a powerful argument that the Court should effectively compel the government to immunize Tatum so that he could testify."  Def.'s Mot. at 3.  In fact, Quinn made this argument during the course of trial, and the Court denied the request.  In light of D.C. Circuit precedent, the Court is unconvinced that a compelled immunity ruling would have been any different if the suppressed information had come to light before Quinn's trial began.  <u>See</u> <u>United States v. Perkins</u>, 138 F.3d 421, 424 n.2 (D.C. Cir. 1998) (holding that the district court lacked authority to grant a witness use immunity and deferring the issue of whether a court could compel the government to grant use immunity in extraordinary circumstances); <u>United States v. Lugg</u>, 892 F.2d 101, 104 (D.C. Cir. 1989) (explaining that "it is not the proper business of the trial judge to inquire into the propriety of the prosecution's refusal to grant use immunity to a prospective witness") (internal quotation marks and citation omitted).

The Court agrees, however, that the withheld information could have had a significant impact on the credibility of Douglas.  "When the undisclosed <u>Brady</u> material consists of

impeachment evidence, a court seeking to determine the probable impact of the violation must form some idea about how effectively the evidence could have been used in cross-examination." Bowie, 198 F.3d at 911.  Here, the information could have had a real impact on the credibility of Douglas (and hence on the credibility of the government's investigation).

On cross-examination, Douglas would have had to admit at least that Tatum appeared not to have been truthful with the government on an important point and that Douglas had relied on Tatum's misstatements to initiate an investigation of Quinn and to obtain a warrant for his arrest. Douglas would have had to admit, therefore, that the government's case against Quinn had been initiated on the basis of what later turned out to be false evidence.  In so admitting, Douglas might well have conceded that Tatum apparently had not told Quinn that indirect shipments to Iran were illegal.  See Cuffie, 80 F.3d at 518 ("In light of the axiomatic importance of truthful testimony for the integrity of judicial proceedings, undisclosed evidence of a witness' prior perjury has a significant impact on the fairness of the trial.").  Faced with Tatum's e-mails, which explicitly approve of indirect shipments to Iran, Douglas would be hard-pressed to explain why he believed Tatum when there was a wealth of evidence contradicting his statements.[4]  Douglas might have acknowledged that Tatum had in fact told Quinn that shipments to Iran should be made in an indirect manner through Sharpline.

Following this line of inquiry, Quinn could continue to press on Douglas' credibility. Quinn could probe Douglas' investment in the case and his motivation to have a successful

---

[4]It is not enough to say that Quinn could have pursued this cross-examination of Douglas anyway, for the lynchpin of an effective cross-examination is the government's (and hence Douglas') acknowledgment that Tatum had not been truthful in his statements to the government about what he had told Quinn concerning indirect shipments to Iran; without that, the cross-examination was fraught with risk.

prosecution to cover what could be perceived as crucial mistakes made during the beginning of the process (i.e., relying on Tatum's false statements).  Since Douglas was the only person who testified about false statements Quinn allegedly made after his arrest, the jury may have questioned the accuracy of Douglas' recollection of those events based on this new information. Those alleged statements by Quinn were not recorded, and the jury had nothing to rely on other than Douglas' testimony.  Thus, this line of cross-examination might have substantially damaged Douglas' credibility as a witness, and thus could have affected the jury's evaluation of the evidence he presented.

The government again argues that Quinn's impeachment efforts would not have been successful because Douglas only had doubts about Tatum's credibility at the time -- he did not know that Tatum's statements were false.  See Gov't Opp. at 29, n.18.  The Court finds this argument unconvincing and concludes that the same themes might nevertheless have been revealed on cross-examination.  At the very least, Douglas might have admitted at trial that he had serious doubts about the truthfulness of Tatum's statements.  Armed with the new information regarding Tatum's untruthfulness, the defense could have explored and developed the point further on cross-examination -- that is, after all, what skilled lawyers are paid well to do.  Furthermore, Douglas would have admitted that "he did not do any investigation regarding [his] suspicions about Tatum's credibility."  Douglas Decl. ¶ 6.  Through counsel, Quinn could have portrayed this as willful ignorance, and the jury might question why the lead case agent would not actively seek out the truth on this important point before continuing with a prosecution.  Surely, then, the fairness of the verdict is called into question by Quinn's inability to present this information to the jury through an effective cross-examination of Douglas.

The impeachment of Douglas would highlight a theme Quinn could have pursued had he been timely provided with the information regarding Tatum: attacking the integrity of the government's investigation.  All along, Tatum pointed the finger at Quinn in what Quinn argued was Tatum's attempt to deflect attention from his own culpability.  See Def.'s Reply Ex. C at 106:3-5 ("The defense case will be that Clark executives panicked at the time of the search, and decided to kind of throw these two guys [Quinn and Holland] under the bus.").  Despite Quinn's arguments, the government never seriously investigated Tatum or viewed him as anything other than a mere witness until the eve of trial.  When the government's assessment changed, it was obliged by basic principles of fairness to inform Quinn in a timely manner so as not to unfairly prejudice his ability to present a defense at trial.

A similar occurrence was discussed in Kyles v. Whitley, 514 U.S. 419 (1995).  There, an informant gave contradictory statements to the police, which implicated the defendant.  The government failed to disclose the informant's contradictory statements to the defense and failed to call the informant to testify at trial.  Id. at 430.  Although the defense theory was that the informant framed the defendant to shift suspicion away from himself, the jury found the defendant guilty.  Id. at 429-30.  When the case reached the Supreme Court, the Court determined that the government had committed a Brady violation in withholding various witness statements, including statements of the informant.  Id. at 441-42.  In discussing the prejudice that ensued, which warranted a new trial, the Court explained how the defendant was robbed of the opportunity to attack the thoroughness and good faith of the government's investigation.  Id. at 442 n.13.  Even if the informant did not testify at the trial, "the defense could have examined the police to good effect on their knowledge of [the informant's] statements and so have attacked the

-24-

reliability of the investigation in failing even to consider [the informant's] possible guilt." Id. at 446 (citing Bowen v. Maynard, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible Brady violation."), and Lindsey v. King, 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding a new trial because withheld Brady evidence "carried within it the potential . . . for the . . . discrediting . . . of the police methods employed in assembling the case")).  Similarly here, Quinn could have used the information regarding the government's suspicions of Tatum to conduct a pointed attack on the government's investigation, with its uncritical reliance on Tatum.

It is worthwhile to summarize again the essence of the Brady violation at trial.  It was clear that the defense theory rested on Tatum's lack of truthfulness to the government concerning what Tatum had told Quinn regarding the illegality of indirect shipments to Iran, and that Quinn considered Tatum to be the critical witness in the case.  The government had clearly and consistently confirmed that it would call Tatum in its case-in-chief.  On November 25, 2005, the government decided not to call Tatum as a witness because of serious concerns that Tatum had not been truthful.  Then, on November 27, the date before opening statements, the government informed Tatum's counsel that Tatum would not be called as a witness by the government and was no longer merely a "witness" in the investigation of Iran embargo violations -- a conclusion based on the prosecution's determination that Tatum was instead a target.  Quinn was told nothing, however, and hence made his opening statement and began his defense believing (based on the government's representations) that Tatum would be a key government witness and focusing in his opening on Tatum's credibility.  On the evening of November 29, two days into

the trial, the government informed Quinn, without further explanation, that Tatum would not be a witness.  Quinn tried, without success, to secure Tatum's testimony, but the government declined to give immunity.  The government took no further steps to investigate Tatum, or charge him, until late January or early February 2006, and did not decide on the false statement plea -- based on Tatum's untruthfulness regarding what he told the government with respect to his advice to Quinn on the illegality of indirect shipments to Iran -- until March or April 2006.  Quinn was not informed of these developments prior to his sentencing on February 23, 2006.  As a result of the government's failure timely to provide Quinn with the important information that Tatum would not be a witness and that the government had concluded he was not credible on the key issue of whether he had advised Quinn that indirect shipments to Iran were illegal, Quinn's opening statement was misdirected, effective cross-examination of Douglas was stymied, the defense was unable to develop fully an attack on the credibility of the government's investigation (to the extent it rested on Tatum's misstatements), and the jury was never informed that Quinn's supervisor (Tatum) had _not_ told him indirect shipments were illegal but had lied to the government about that, while Douglas' volunteered testimony that Tatum had advised Quinn not to ship to Iran remained untested by cross-examination.

The government's failure timely to provide crucial information regarding a witness (Tatum) who was critical to the case and Quinn's defense -- information clearly favorable to Quinn to the extent it affected the credibility of Tatum and the government's investigation -- plainly prejudiced Quinn.  In short, Quinn could have presented a very different opening and closing argument and could have conducted stronger cross-examinations, particularly of Douglas, to great effect.  As in Kyles, "[t]he jury would have been entitled to find (a) that the investigation

was limited by the [government's] uncritical readiness to accept the story and suggestions of [a witness] whose accounts were inconsistent . . . [and] (b) that the lead [agent] who testified was either less than wholly candid or less than fully informed."  514 U.S. at 453.  This "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Id. at 419.

**B.      The Government's Brady Violations After Trial**

Quinn's sentencing occurred almost three months after he was convicted.  During that time, the government had discussions with Tatum's counsel about how the government would proceed against Tatum.  AUSA Bratt indicated the government might indict Tatum as a co-conspirator but that the government was "willing to consider a lesser charge if Tatum entered into a timely pre-indictment plea agreement."  Bratt Decl. ¶ 8.  Bratt also believes he "mentioned a false statement charge under 18 U.S.C. § 1001 as a possible basis for an early plea."  Id. Remarkably, however, the government never informed Quinn prior to his sentencing about Tatum's false statements, and the government never informed Quinn that it was contemplating a no-jail plea agreement for Tatum even though Quinn had repeatedly requested any information that could mitigate his own sentence.  See Def.'s Ex. K at 3 (specifically requesting information about export control cases where defendants had "been permitted to plead guilty pursuant to a plea agreement that resulted in a non-custodial criminal sentence").  Instead, at Quinn's sentencing, the government simply represented that it was "actively pursuing" matters against Tatum.  See Def.'s Reply Ex. K at 29.

No doubt, the government intentionally withheld from Quinn at sentencing the information about Tatum and his potential plea agreement.  In response to Quinn's request for

discovery, the government stated that "[a]s this is not a capital case, the government has no obligation whatsoever to provide -- at any time -- information that would mitigate the sentence the defendants would receive upon being found guilty of the charges against them, and we will not do so." Def.'s Ex. L at 3. But Brady covers information favorable to an accused regarding guilt or punishment, see Brady, 373 U.S. at 87, and the government now concedes that its Brady obligations extended past Quinn's trial, through his sentencing, and to matters affecting his punishment. See Mot. Hr'g Tr. at 70-71; see also Morrow, 412 F. Supp. 2d at 158 (explaining the government's ongoing burden to provide Brady information); Blackley, 986 F. Supp. at 601. The information about Tatum's plea falls within the strictures of Brady -- as it is favorable to the accused and material to his sentencing. See United States v. Williams-Davis, 90 F.3d 490, 514 (D.C. Cir. 1996) (adopting the approach of the Third and Ninth Circuits requiring that a defendant "raise at least a colorable claim that the [disputed material] contained evidence favorable to [him] and material to his claim of innocence or to the applicable punishment") (citations omitted and emphasis added). The Court and Quinn focused at sentencing on the sentences others had received for similar conduct (and the sentences of others involved in the Iran embargo violations at CMHC). Surely Tatum's plea and likely sentence were highly relevant to that assessment and aided Quinn's argument.

This Court also has no trouble concluding that Quinn was prejudiced without access to the information about Tatum. At sentencing, the Court focused on the issue of unwarranted sentencing disparities and asked each party to identify three cases that it believed were most comparable to Quinn's. See Def.'s Ex. O at 49:22-24. The government stated that the most relevant sentence was that given to another individual involved in CMHC's violations -- Khalid

-28-

Mahmood.  See id. at 53:14-15 (arguing that "there is nobody more similar to Mr. Quinn than

Mr. Mahmood").  Even though Mahmood was sentenced for other conduct, he was a cooperating

co-conspirator regarding the violation of export control laws.  Thus, the government argued that

Quinn's sentence should be much more severe than the 17-month term of incarceration given to

Mahmood to avoid "a disparity within this case that the government believe[d] would be

inappropriate."  Id. at 54:13-17.

     Noting that the avoidance of sentencing disparities was an "important factor," the Court

agreed that Mahmood's sentence was an appropriate benchmark because he was an alleged co-

conspirator.  Id. at 100:6; 101:16-25.  The Court concluded that "absent some compelling reason

to the contrary, the defendant's sentence should be significantly greater than that of Mr.

Mahmood."  Id. at 101:23-25.

     Yet the government sought to foster an even greater disparity within this case by seeking

a sentence of eight to ten years for Quinn while extending what amounted to a no-jail offer to

Tatum, Quinn's supervisor at CMHC involved in the same events.  As the Court noted at Quinn's

sentencing:

> At the very least, it is beyond dispute that Tatum's approval or guidance at some point
> was sought by the defendant or others at Clark.  And the government's actions with
> respect to this case would indicate that it agrees now certainly that Tatum played an
> important role in at least some of the activities that led to this criminal conviction.

Def.'s Reply Ex. K at 35.  This Court thus concludes that had Quinn and the Court been apprised

of the circumstances regarding Tatum, the result of Quinn's sentencing would have been different

based on an analysis of Quinn and other similarly situated individuals including Tatum pursuant

to 18 U.S.C. § 3553(a)(6).

Quinn argues that the prejudice he suffered at sentencing independently entitles him to a new trial under Fed. R. Crim. P. 33 because he cannot obtain a modification or reduction of his sentence under Fed. R. Crim. P. 35 or 18 U.S.C. § 3582.  See Def.'s Mot. at 23.  The text of Rule 35 limits re-sentencing to motions brought by the government, primarily based on substantial assistance.  And § 3582 only allows for a modification of a prison term in three limited circumstances: (1) when the Director of the Bureau of Prisons files a motion making such a request, (2) when the applicable sentencing range has been subsequently lowered by the Sentencing Commission, or (3) where expressly permitted by statute or by Rule 35.  Since Quinn cannot obtain relief under Rule 35 or under § 3582, he argues that "it cannot be the case that no remedy exists where the government violates its obligations under Brady by withholding essential, mitigating information from the defendant until after sentencing."  Def.'s Reply at 19.

Although the Court agrees that a defendant in such a situation should have some remedy,[5] Quinn cites no authority to support the proposition that a new trial would be warranted when a Brady violation only affected a defendant's punishment and sentencing had already occurred.  Indeed, to grant the relief Quinn seeks under Rule 33 would seem flatly inconsistent with the principles of finality of the judgment and sentence reflected in Rule 35 and § 3582.  And it would be an odd result and a waste of judicial resources to grant a new trial under Rule 33 for the sole purpose of obtaining a sentence modification.  Because the government's Brady violations here extended to both guilt and punishment, however, the Court does not have to resolve the dilemma of a proper remedy for Brady violations that run to punishment alone.  Here, the government's

---

[5]Quinn may, of course, ultimately have recourse available to him pursuant to 28 U.S.C. § 2255.

Brady violations in connection with sentencing buttress Quinn's arguments about the lack of fairness in his trial proceedings.  Considering the full continuum of the government's conduct, the Court finds that Quinn is entitled to a new trial under Rule 33.

### C.  Due Process Violations Generally

Recognizing that the Brady doctrine may not comfortably encompass the violations that occurred at Quinn's trial and sentencing, the Court finds in the alternative that a new trial is warranted based upon a general denial of due process.  "Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice.'" United States v. Valenzuela-Bernal, 458 U.S. 858, 872 (1982) (citation omitted).  To declare a denial of due process, the Court "must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." Id. Other courts -- even after concluding that a Brady violation did not occur -- have assessed a defendant's arguments for a new trial under this framework.  See Nassar v. Sissel, 792 F.2d 119, 121 (8th Cir. 1986); see also United States v. Gonzales, 90 F.3d 1363, 1369 n.3 (8th Cir. 1996) (stating that even when a Brady violation has not occurred, a situation "may implicate other constitutional provisions, such as the Fifth Amendment's due process guarantees generally"). After all, Rule 33 provides that the court "may vacate any judgment and grant a new trial if the interest of justice so requires" -- and the interest of justice certainly so requires when a defendant is denied the fundamental right to a fair trial.

In analyzing whether a defendant's due process rights were violated by the belated disclosure of information, courts look to the record as a whole to determine whether the information was revealed in time for the defendant to benefit from its use at trial and, if not,

-31-

whether the defendant was therefore denied a fair trial. See United States v. Almendares, 397

F.3d 653, 663 n.3 (8th Cir. 2005) (stating that "[d]ue process is generally satisfied if evidence is

disclosed in time for the defense to take advantage of it"). As discussed above, neither before nor

during trial did the government reveal to Quinn its serious concern that Tatum had been

untruthful regarding the key issue of whether he had advised Quinn about the illegality of indirect

shipments to Iran, and the government never revealed, before or during trial, that Tatum had

become a target of the investigation. Quinn was thereby denied the ability to use information to

support arguments at the very heart of his defense. See United States v. Colomb, 448 F. Supp. 2d

750, 756 (W.D. La. 2006) (determining that defendants' due process rights were violated when

the court failed to grant a mistrial and defendants were rendered "unable to present to the jury . . .

information that became known to the Court and the lawyers during the trial -- information that

went to the very heart of the defenses they raised for their clients"). The federal courts simply

"do not approve of any government agent avoiding a forthright disclosure of relevant

information." Almendares, 397 F.3d at 664. Here, the withholding of that relevant information

plainly changed the dynamic of the trial -- at Quinn's expense.

 Furthermore, it is fair to say that the government's actions went so far as to affirmatively

mislead Quinn on material aspects of the trial. The government allowed Quinn to proceed with

his opening statement and the examination of several witnesses with the understanding -- based

on the government's consistent representations -- that Tatum would be called as a government

witness, even though the government knew to the contrary before opening statements were even

made. In United States v. Wang, similar conduct occurred where the government was not

forthright with relevant information and only belatedly disclosed that it would not be calling a

-32-

witness due to increasing doubts about his credibility.  <u>See</u> 1999 WL 138930.  Although the government disclosed this information in <u>Wang</u> one week before the trial was scheduled to commence, the court determined that "[e]ven if the Government reasonably and in good faith determined that [the witness'] testimony was not necessary to its case in chief, the Government's failure either to notify defendants that they were not going to call [the] witness or to keep track of [the witness] . . . , displayed a 'reckless disregard for the value of [the witness'] . . . potential testimony' to the defense case."  <u>Id.</u> at *52 (citation omitted).  The court expressed its concerns that proceeding to trial "would violate the Fifth and Sixth Amendments and the sense of fairness that is inherent in our judicial system."  <u>Id.</u> at *35.  Hence, the court in <u>Wang</u> dismissed the indictment concluding that the cumulative effect of the government's actions "would deny Defendants a fair trial."  <u>Id.</u>

Here, of course, the damage has already occurred.  The government failed to investigate Tatum's false statements before trial, notwithstanding Quinn's defense theory.  Then, once serious concerns arose, Quinn was not informed of the doubts about Tatum's credibility and truthfulness, doubts that had transformed him into a target of the investigation.  The government also misled Quinn regarding its intentions concerning Tatum as a witness.  And the government intentionally withheld highly relevant information about Tatum's potential plea agreement from Quinn at his sentencing.  The cumulative effect of the government's conduct fatally infected the proceedings with an absence of "that fundamental fairness essential to the very concept of justice." <u>Valenzuela-Bernal</u>, 458 U.S. at 872.  At bottom, the government's actions denied Quinn his "basic right to a fair trial, not a perfect trial, but a fair trial."  <u>Colomb</u>, 448 F. Supp. 2d at 756.

## II.     The <u>Napue</u> Claim

Quinn actually devotes most of his briefing to his <u>Napue</u> claim, and understandably so, because <u>Napue</u> sets forth a very defense-friendly standard.  A defendant need only show that false testimony was presented at trial, that the government knew, or should have known, that the testimony was false, and that there is a reasonable likelihood that the false testimony could have affected the judgment of the jury.  <u>See</u> <u>Napue</u>, 360 U.S. at 269; <u>see also</u> <u>Agurs</u>, 427 U.S. at 103. Because the integrity of our justice system relies on the presentation of truthful evidence for a jury to evaluate, "the prosecution's knowing use of false testimony entails a veritable hair trigger for setting aside the conviction."  <u>Gale</u>, 314 F.3d at 4; <u>see also</u> <u>United States v. Williams</u>, 233 F.3d 592, 594 (D.C. Cir. 2000) (noting that "[t]he phrases -- 'reasonable likelihood,' 'could have affected' -- 'mandate a virtual automatic reversal of a criminal conviction'") (citation omitted). Despite this liberal test, Quinn is unable to demonstrate that his trial was marred by a <u>Napue</u> violation for one simple reason -- the statement at issue was not actually false.

Quinn's <u>Napue</u> challenge revolves around one statement that Douglas made during cross-examination.  Counsel was asking Douglas about information that should have been included in the sworn affidavit he signed on December 23, 2004, in support of Quinn's arrest warrant.  In response, Douglas volunteered information that he had relied on in drafting the affidavit.  He responded: "We did have statements from Mr. Tatum that said he had advised Mr. Quinn and Mr. Holland not to ship to Iran."  Def.'s Ex. B. at 824:10-12.  Quinn argues that with this statement, given in response to his own question, the government "succeeded in introducing hearsay evidence of the false statement that Tatum had made implicating Quinn."  Def.'s Mot. at 7.

The government counters that Douglas was "truthfully attempting to explain his own state

-34-

of mind in writing the affidavit, rather than representing the Tatum statement as having been true."  Gov't Opp. at 28.  The Court agrees with that assessment.  There was nothing false about Douglas' statement.  He simply stated that when he crafted his affidavit in December 2004, he had statements from Tatum indicating he had advised Quinn not to ship to Iran, and Douglas did indeed have such statements when he wrote the affidavit.  Because Douglas testified truthfully, Quinn's Napue claim must fail.  See Gale, 314 F.3d at 3 (rejecting a Napue/Agurs claim because the witness' statements at trial were not false).  The problem with Douglas' testimony was not its literal falsity, but rather the incompleteness discussed above in the context of the Brady and general due process violations.

Even going one step further to examine the substance of Tatum's statement that Douglas referenced, the Napue claim still fails.  Tatum did advise Quinn not to ship directly to Iran, and Quinn so concedes.  Throughout the course of the prosecution, Quinn repeatedly argued that any fair reading of Tatum's e-mail correspondence "shows that on all three of those e-mails he is saying direct contact, no-no, indirect shipment, that's fine."  Def.'s Reply Ex. C at 105:7-10.  Because no specific reference was made by Douglas to Tatum's false statement regarding his advice on indirect shipments, and because Tatum did advise Quinn "not to ship to Iran" (although only regarding direct shipments), Douglas' testimony was not literally false.  Hence, there was no Napue violation even examining the substance of Tatum's statement that was referenced by Douglas.[6]

_____

[6]Again, the problem with the substance of Tatum's statement was not its literal falsity but its incompleteness.  Even the government admits that arguably the jury could have interpreted Douglas' statement to indicate that Tatum had advised Quinn not to ship indirectly to Iran.  See Gov't Opp. at 17 n.9.  Because the government had not revealed important information to Quinn that would help him effectively to cross-examine Douglas to clarify this issue, it is possible that

-35-

**CONCLUSION**

This case was unfortunately plagued by a serious misstep by the government.  The

government was presented with several opportunities to disclose information favorable to the

defense, but it instead chose to withhold that valuable information, thereby unfairly prejudicing

Quinn in the presentation of his defense.  In the end, the Court is unable to conclude that Quinn

received a fair trial and a verdict worthy of confidence, and hence certifies to the Court of

Appeals at this time that, for the foregoing reasons, it intends to grant a new trial under Fed. R.

Crim. P. 33.  The Clerk shall promptly transmit this Memorandum Opinion to the Court of

Appeals.


_____/s/_____
JOHN D. BATES
United States District Judge


Date: <u>February 28, 2008</u>

---

the jury was misled by Douglas' volunteered statement.  This possibility further supports the
Court's conclusion that Quinn's due process rights were violated by the government's conduct.

-36-